IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Ricky A. Jennings, ) | |
| ) | Civil Action No. 2:14-00929-RMG-MGB |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Charleston County Sheriff's Department; ) | |
| Al Cannon, Sheriff of Charleston County; ) | |
| and Deputy Poirier, ) | |
| ) | |
| Defendants. ) | |

This matter is before the Court on the Motion of the Defendants, Charleston County Sheriff's Department ("CCSD"); Al Cannon, Sheriff of Charleston County ("Sheriff"); and Deputy Poirier ("Poirier") for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 47.) On March 17, 2014, Plaintiff Ricky A. Jennings ("Plaintiff"), acting *pro se,* brought this action pursuant to 42 U.S.C. § 1983 alleging that Poirier used excessive force against him during a traffic stop on June 2, 2013. (Dkt. No. 1.) Defendants answered the Complaint on July 16, 2014. (Dkt. No. 31.) After receiving two extensions to file dispositive motions, Defendants filed this Motion for Summary Judgment on January 5, 2015. By order filed January 8, 2015, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), Plaintiff was advised of the summary judgment procedure and the possible consequences if he failed to adequately respond to the Motion. (Dkt. No. 51.) After receiving three extensions to respond, Plaintiff filed a Response in Opposition ("Opposition") with supporting documents on May 18, 2015. (Dkt. Nos. 57, 61, and 69.) Defendants filed a Reply to the Response in Opposition to the Motion for Summary Judgment ("Reply") on May 29, 2015. (Dkt. No. 75.)

1

I.     FACTUAL ALLEGATIONS

Plaintiff alleges that on June 2, 2013, he was traveling in a U-haul truck north on Highway 17 near Charleston. (Dkt. No. 1, p. 3). He noticed a police cruiser following him and activating blue lights. Id. He continued until he saw a clearing on his right and pulled over. Id. Plaintiff states that the video dash cam recorded him exiting the vehicle with his hands "completely exposed." Id. The officer (Poirier) pointed her "tazer" and Plaintiff fled into a wooded area. Poirier pursued him and fired her "tazer," striking him in the back. (Dkt. No. 1, p. 4.) Plaintiff fell, but began to recover and rose to his feet. Id. Plaintiff further alleges as follows (verbatim):

> As I stood the officer attempted to handcuff me. I once again attempted to flee. I then broke away and heard a pop and a slight jolt to my back. I turned to partially face the officer and I then saw her fire a second shot striking me in my fossa/forearm. I stumbled and fell, my legs unable to move. As I was falling I once again felt the affects of a tazer. As I lay on the ground the officer screamed "stay down, you [expletive] stay down.["] I yelled back "I'm down, I'm down.["] The officer then ran over and began to apply to handcuffs. All the while she pulled and jerked on my collar ordering me to stay down. I later realized that this was theatrical. This officer alone cuffed me before any other officers arrived. I alledge she used excessive force. I was unarmed and always showed my hands exposed. While attempting to flee, I never took any aggressive posture with the officer. The officer fired no warning shots and clearly shot to kill an unarmed man. She reported a violent confrontation, but reported no injury visable or non-visable. I am now a paraplegic as a result of her malice.

(Dkt. No. 1, p. 4.)

Plaintiff goes on in his Complaint to challenge the credibility of Poirier and the other deputy who arrived on the scene, Newkirk. Plaintiff's challenges include: that the video shows both his hands clearly visible; the video shows him completely unarmed as she pursued him into the woods, tazed and shot him, an unarmed subject who "only fled"; the officer's injury report does not reflect that Plaintiff and she fought on the ground in a "vigorous struggle"; and that reports of Poirier and Newkirk contradict each other in various ways. (Dkt. No. 1, pp. 5-6.)

2

Plaintiff attached to his Complaint a photo still from the dash cam video and various reports of the incident from the CCSD and SLED, including a report of Newkirk. (Dkt. No. 1-1, pp. 1-18.) According to Newkirk, he and Poirier were at lunch when they got the call from dispatch about a suspected drunk driver in a U-haul truck. (Dkt. No. 1-1, p. 4.) Poirier left to take the call. Newkirk was in radio contact with Poirier when she was trying to conduct a traffic stop of Plaintiff, and she told Newkirk that the vehicle was stopping. Id. Poirier then relayed that the vehicle was turning on to Pole Yard Drive. Id. She had no further radio contact with Newkirk. Id. Newkirk arrived at the scene looking for Poirier. When he was in front of the U-haul, he heard three shots and went in that direction. He found Poirier "fighting with suspect at gunpoint." Id. at p. 5. Newkirk approached Poirier and assisted with getting Plaintiff under control and in custody. Id.

Poirier submitted an affidavit in support of the Motion for Summary Judgment. (Dkt. No. 47-2.) Her version of events are more detailed and different from Plaintiff's version. She was responding to a call from a concerned citizen, broadcast by dispatch, about a driver of a U-haul truck heading north on Highway 17 who was driving erratically and possibly driving under the influence ("DUI"). (Dkt. No. 47-2, ¶5.) Poirier advised dispatch that she would investigate the call; she found and followed the U-haul truck (which Plaintiff was driving). (Dkt. No. 47-2, ¶6, 7.) Poirier activated her video camera and followed Plaintiff, who was operating the vehicle erratically; she believed it to be a possible DUI. (Dkt. No. 47-2, ¶¶7, 8.) Poirier activated her lights and sirens, but Plaintiff did not slow down or stop immediately. (Dkt. No. 47-2, ¶¶9, 10.) Plaintiff pulled over after approximately three (3) miles. (Dkt. No. 47-2, ¶10.)

According to Poirier's sworn statement, when Plaintiff stopped, he immediately exited the U-haul truck and was looking at her while repeatedly reaching back into the cab of his truck. Her immediate belief and concern was that he was reaching for a weapon. (Dkt. No. 47-1, ¶12.) Based on what had occurred thus far, she was conducting this as a "felony traffic stop," which means that she put herself in a tactical position inside the door jamb of the patrol car and drew her weapon, aimed it at the suspect and ordered him to let her see his hands. Without knowing if he had a weapon, she was in fear for her life. (Dkt. No. 47-2, ¶13.) Even with the gun drawn on him, Plaintiff refused to place his hands above his head. Poirier was unsure if Plaintiff had anything, including a weapon, in his hands. Plaintiff continued to reach his hands into the cab of the truck, and her "greatest concern" was that he was armed. (Dkt. No. 47-2, ¶14.) Plaintiff refused to follow her orders to keep his hands where she could see them and to get back into the U-haul. (Dkt. No. 47-2, ¶15.) Then, "for unknown reasons," Plaintiff ran into the woods and Poirier gave chase. (Dkt. No. 47-2, ¶16.)

During the chase, Poirier kept giving verbal commands that Plaintiff stop and get on the ground, but Plaintiff continued to run and throw items on the ground. (Dkt. No. 47-2, ¶16.) During the foot chase, Poirier still did not know if Plaintiff was armed or why he was fleeing. (Dkt. No. 47-2, ¶17.) Poirier continued the chase until Plaintiff came out of the woods near a boat landing area. Poirier was concerned for her personal safety and public safety since she was not sure if there were innocent civilians in the area, as it was a public boat landing near a public road. Id. Poirier commanded him to stop and told him she would use her taser if he did not stop. Despite this warning, the suspect continued running until she got close enough to tase him in the rear torso. (Dkt. No. 47-2 ¶18.)

4

Plaintiff fell to the ground when the taser made contact.  Poirier was able to partially subdue him and get one handcuff on, but Plaintiff continued struggling again and was trying to stand up. (Dkt. No. 47-2, ¶19.)  Poirier commanded Plaintiff to stop struggling and warned that she would use her taser again, but he continued to struggle. (Dkt. No. 47-2, ¶20.) During the struggle, Poirier tased Plaintiff two more times, with no effect. Id. At some point, the taser became dislodged from Poirier's hand and she could not get to any other weapon in her possession. (Dkt. No. 47-2, ¶21.) To gain control of the "uncooperative and aggressive suspect," she punched him four times in the left jaw. Id. This caused swelling to her hand, but no broken bones, as later shown by x-rays. Id. The blows had no significant effect on Plaintiff, and he continued to fight, struggle, and resist arrest. (Dkt. No. 47-2, ¶22.)  At the time of this incident, Poirier was 5'1" and 108 pounds; she estimated Plaintiff to be 5'10" and 190 pounds.  (Dkt. No. 47-2, ¶22.)[1] As the struggle continued, Poirier fell on her back and Plaintiff was able to get on top of her and tried to reach for her service weapon. (Dkt. No. 47-2 ¶23.) She thought Plaintiff was going to kill her. Id.

Poirier was able to get Plaintiff off of her and get to her feet. (Dkt. No. 47-2 ¶24.) Plaintiff got to his feet and faced her in a "fighting stance" about ten (10) feet away.  Plaintiff's eyes were wide open, "he appeared deranged," and he kept trying to reach in his pockets apparently to pull something out. Id. Poirier thought he was trying to pull a weapon out. Id. Poirier pulled out her gun, pointed it at Plaintiff, and ordered him to show his hands, warning that if he did not, she would shoot him. (Dkt. No. 47-2 ¶25.) Plaintiff did not obey and "remained in his fighting stance, while still struggling to get something unknown out of his pocket." Id. Poirier believed she was in grave danger of physical harm or death as she was

---

[1] Plaintiff states in his Reply that he is 5'5" and 165 lbs. (Dkt. No. 69, p. 2.)

"alone without back-up in a deserted place with a much larger, unpredictable, and aggressive suspect." Id. She fired her weapon twice "in fairly quick succession." Id. The first shot struck Plaintiff in the arm and did not immobilize him; the second shot was to the abdomen[2], which caused him to fall on the ground. (Dkt. No. 47-2 ¶27.)

Poirier states that during the struggle, she was covered with dirt, disheveled, and her radio had somehow been turned off. She was able to turn it back on and radio dispatch that EMS was needed. (Dkt. No. 47-2 ¶28.) When Poirier approached Plaintiff to handcuff him, he continued to struggle on the ground and refused to put his hands behind his back. (Dkt. No. 47-2, ¶29.) Around this time, Newkirk arrived, and he and Poirier were able to handcuff the Plaintiff. Id.

Plaintiff adds to his factual allegations in his Opposition. Plaintiff alleges that the video shows his attire of t-shirt and jeans and that his clothes and stature "would most likely reveal if he were carrying a firearm." He denies reaching back into the vehicle and denies doing "anything which can be construed as aggressive." (Dkt. No. 69, p. 2.) Plaintiff claims that he was just released from federal prison and was "a man distraught" at the idea of going back to prison and not seeing his family. (Dkt. No. 69, p. 3.) He "just turned and walked away" from Poirier, and Poirier "runs after him with her weapon drawn." Id. Poirier gave a "false report" about the verbal commands she gave him in their initial contact. (Dkt. No. 69, p. 4.) Plaintiff states that after Poirier shoots him with the taser,

> [h]e laboriously rises to his feet still attempting to flee. While in stride, Deputy Poirier attaches the right handcuff. Breaking away, Mr. Jennings then hears a pop and feels a jolt to his lower back. He turns slightly to look over his right shoulder. He sees Deputy Poirier pointing her firearm at him. Immediately another pop and he sees flesh exploding from his right forearm. He collapses to the ground, paralyzed from the first shot which grazes his spine. As he lay on the ground

---

[2] There is a dispute as to whether the entry wound was in Plaintiff's abdomen or in his back, discussed *infra*.

> paralyzed as he is to this day, Deputy Poirier tazed him 2 more times. As she shouts "stay down you [expletive] stay down.["] Mr. Jennings screams back "I'm down, I'm down["] . . . . Deputy Poirier then begins to pull and jerk on his collar and command him to stay down. Mr. Jennings is aware that he is critically wounded. There is no resistance in him whatsoever. Mr. Jennings had no physical ability to resist at that point. … Deputy Poirier easily grabs his left hand, attaches the left cuff and proceeds to call her base.

(Id. at p. 4-5.) Plaintiff also denies that it took two officers to handcuff him. (Dkt. No. 69, pp. 4-5, 9.)

Poirier states that Plaintiff was shot in the abdomen and argues in her Motion for Summary Judgment that Exhibit 4 to the Motion for Summary Judgment shows that Plaintiff was shot in the abdomen. From the face of it, Exhibit 4 is a record of the Grand Strand Regional Medical Center dated June 2, 2013, where Plaintiff was treated for the injuries from this incident. Defendants moved to seal Exhibit 4 because it is the confidential medical record of Plaintiff. (Dkt. No. 48.) The undersigned has issued a text order sealing this Exhibit. That record indicates that Plaintiff presented with "multiple gunshot wounds…. an obvious gunshot wound to left flank, right lateral abdominal wall/flank and right antecubital fossa/forearm…. ABDOMEN: … Positive right lateral abdominal wall/flank gunshot wounds, 2x2 cm with powder burns." (Dkt. No. 47-4.) Plaintiff attached to his Opposition apparently conflicting medical evidence from Grand Strand Regional Center (Dkt. No. 69-1, pp. 6 and 8) and what appears to be from EMS (Dkt. No. 69-1, p. 7), as well as one unknown source (Dkt. No. 69-1, p. 9), all of which indicate that Plaintiff was shot in the left flank/back with the exit wound being the right abdomen.

The video shows only a small portion of the initial stop and shows none of the events transpiring in the woods. (Poirier and Newkirk Videos filed with the Court as Exhibit 3 to Dkt. No. 47-3.) The Poirier video shows her finding and following the U-haul until it turns off the road. (Id. at 12:00:00 to 12:24:10.) The audio reveals Poirier shouting for Plaintiff to show his

7

hands. (Id. at 12:24:20-22.) The footage shows Plaintiff walking in camera range with his hands extended from his sides. (Id. at 12:24:22-25.) The U-haul itself cannot be seen in the camera angle. The video shows Poirier running towards where Plaintiff was last seen. (Id. at 12:24:28-29.) No one appears on the video until another officer, apparently Newkirk, arrives on the scene. (Id. at 12:35:42.) The video does show Poirier returning to the area with the U-haul and her patrol car. (Id. at 12:45:01.) Newkirk's video (Dkt. No. 47-3) shows him arriving at the scene, stating that he heard shots fired and heading in that direction. (Newkirk video, 12:26:38 to 12:27:10.) Neither video helps materially with the analysis of Defendants' motion.

II.     DISCUSSION

　　　A. Legal Standards

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" Id. (quoting Hunt v. Cromartie, 526 U.S. 541, 552 (1999)); see also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).

Once the moving party has made the threshold determination, to survive the motion for summary judgment, the non-moving party may not rest on the allegations averred in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party must

8

demonstrate that specific, material facts exist that give rise to a genuine issue. Id. Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)).

This Court is required to liberally construe *pro se* documents, Estelle v. Gamble, 429 U.S. 97 (1976), holding them to a less stringent standard than those drafted by attorneys, Hughes v. Rowe, 449 U.S. 5 (1980) (per curiam). The mandated liberal construction afforded *pro se* pleadings means that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so, but a district court may not rewrite a petition to "conjure up questions never squarely presented" to the Court. Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985), cert. denied, 475 U.S. 1088 (1996.). The requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. Weller v. Dep't of Soc. Servs., 901 F.2d 387, 391 (4th Cir. 1990).

    B. Analysis

        1. CCSD

The Eleventh Amendment bars suits by citizens against non-consenting states brought either in federal or state court. See Alden v. Maine, 527 U.S. 706, 712-13 (1999); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996). While sovereign immunity does not bar suit where a state has given consent to be sued, or where Congress abrogates the sovereign immunity of a state, neither of those exceptions apply in the instant case. Congress has not abrogated the states' sovereign immunity under §1983, see Quern v. Jordan, 440 U.S. 332, 343 (1979), and South

9

Carolina has not consented to suit in federal district court. S.C. CODE ANN. § 15-78-20(e). Such immunity extends to arms of the state. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 70 (1989); see also Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997) ("[I]t has long been settled that the reference [in the Eleventh Amendment] to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities.").

Sheriffs' departments in South Carolina are considered state agencies. See Carroll v. Greenville Cnty. Sheriff's Dep't, 871 F. Supp. 844, 846 (D.S.C. 1994) ("It is well established in this state that a sheriff's office is an agency of, and a sheriff 'dominated by' the state, such that a suit against the sheriff in his official capacity is a suit against the State."); see also Wirtz v. Oconee Cnty. Sheriff's Dep't, No. 8:13-1041-RMG, 2013 WL 5372795, at *1 (D.S.C. Sept. 24, 2013) ("Under South Carolina law, a sheriff's department is a state agency, not a department under the control of the county."). Accordingly, the undersigned recommends granting summary judgment to Defendant CCSD.

      2.  Sheriff

The only allegation against the Sheriff is in Plaintiff's Opposition:

> According to the Major Crime Scene Log, Sheriff Al Cannon signs in at the scene at 1:37. At 1:54 EMS record another version of the events. They state patient fired shots at police while trying to evade them. Patient was shot in L. flank exit right abdomen. Sheriff Al Cannon being Deputy Poirier's superior no doubt had a say in what version was released to EMS at 1:54.

(Dkt. No. 69, p. 8.)

The doctrines of vicarious liability and respondeat superior are generally not applicable in § 1983 actions. Vinnedge v. Gibbs, 550 F.2d 926, 927-29 (4th Cir. 1977); see also Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978) (holding "that a municipality

10

cannot be held liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"). However, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). In such a case, liability "is not premised on *respondeat superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Id. (citations omitted). A plaintiff in a supervisory liability case "assumes a heavy burden of proof," as the plaintiff "not only must demonstrate that . . . [he] face[s] a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices." Id. at 373 (internal quotation marks and citations omitted). Generally speaking, a plaintiff cannot satisfy this heavy burden of proof "by pointing to a single incident or isolated incidents," but "[a] supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id. (citations omitted).

The single allegation against the Sheriff is speculative at best and does not rise to deliberate indifference or acquiescence in Poirier's alleged constitutionally offensive conduct. The undersigned recommends that summary judgment be granted to Defendant Cannon.[3]

---

[3] Plaintiff generally states that there is a practice in Charleston County, and a national dialogue, surrounding police shootings like this case. (Dkt. No. 69, pp. 10-11.) There are no facts alleged underlying this general statement that support a cause of action for a supervisor's continued indifference to, or tacit authorization of, documented widespread abuses by the Sheriff specifically.

11

3. Deputy Poirier

Poirier argues that the Motion for Summary Judgment should be granted to her on two grounds: 1) that only constitutionally protected force was used to apprehend a fleeing suspect and effectuate an arrest; and 2) that she is entitled to qualified immunity. (Dkt. No. 47-1, p. 8.) Both arguments require that there be no genuine issue of material fact.

The Fourth Amendment's prohibition against unreasonable searches and seizures includes the right to be free from "seizures effectuated by excessive force." Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006); see also Graham v. Connor, 400 U.S. 386, 394-95 (1989). Whether an officer has used excessive force is analyzed under a standard of objective reasonableness. Scott v. Harris, 550 U.S. 372, 381 (2007); see also Kentucky v. King, 131 S.Ct.1849, 1859 (2011). In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed. Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996). Careful attention should be paid to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

> The standard of review is an objective one, and the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force. Anderson v. Russell, 247 F.3d 125, 129 (4th Cir.2001). "[T]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. (internal citations omitted). The Graham Court instructed that a reviewing court must make "allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." 490 U.S. at 397. "The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir.1996) (citations omitted).

Johnson v. Cnty. of Greenville, No. 6:13-CV-01652-JMC, 2015 WL 4508812, at *18 (D.S.C. July 24, 2015). The use of deadly force is reasonable only "[w]here [an] officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." Tennessee v. Garner, 471 U.S. 1, 11 (1985). Thus, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Garner, 471 U.S. at 11-12.

     Poirier's Motion for Summary Judgment fails to take the facts in the light most favorable to the Plaintiff, instead relying solely on her own factual version of the events surrounding the stop, the chase, and the application of force. A number of those material facts are disputed. Clearly, there is a genuine issue of material fact concerning whether the Plaintiff posed a threat of serious physical harm to Deputy Poirier or others.

     Plaintiff denies that he reached back into the vehicle during the initial traffic stop which was part of the basis for Poirier's "felony traffic stop" and her suspicions that he was armed. (Dkt. No. 47-1, ¶12.) Plaintiff denies that he refused to keep his hands where Poirier could see them (Dkt. No. 1, p. 3), and the video does indeed show his hands were in plain view for the brief period of time Plaintiff is covered by the camera angle. (See video. ) Plaintiff admits fleeing but denies taking any aggressive posture with Poirier. (Dkt. No. 1, p. 4; Dkt. No. 69, p. 3.) Plaintiff denies fighting and struggling with Poirier. (Dkt. No. 69, pp. 4-5, 7.) As noted *supra*, the record contains conflicting evidence concerning whether Plaintiff's entry wound was in the back with the exit wound in his right abdomen, or whether the entry wound was the abdomen, with the exit wound in his back. Even though Plaintiff admits fleeing Poirier, both at the scene of

the traffic stop and again in the woods after he was tased, there exist genuine issues of material fact as to the events leading up to the shooting. The video from the dash camera is of little utility because it only captures part of the traffic stop. There are conflicting inferences that can be drawn from even that small portion of video footage. Summary judgment cannot be granted with this level of material factual dispute.

Likewise, Poirier's argument for summary judgment based on qualified immunity fails. It would be inappropriate at this stage to find there is no dispute of material facts as to whether Poirier's assessment of Plaintiff, as a serious and immediate danger, was reasonable as a matter of law. "'Disputed facts are treated no differently in this portion of the qualified immunity analysis than in any other context.'" Kane v. Beaufort Cnty. Sheriff's Dep't, C.A. No. 9:14-508-RMG, 2015 WL 404570, at *5 (D.S.C. Jan. 29, 2015) (quoting Vathekan v. Prince George's Cnty., 154 F.3d 173, 180 (4th Cir. 1998)). Accordingly, "'summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants.'" Id. (quoting Vathekan, 154 F.3d at 180).

III.     CONCLUSION

For the foregoing reasons, the undersigned recommends that the Defendants' Motion for Summary Judgment (Dkt. No. 47) be GRANTED in part and DENIED in part. It is recommended that summary judgment be granted to Defendants Charleston County Sheriff's Department and to Al Cannon, Sheriff for Charleston County. It is recommended that summary judgment be DENIED to Deputy Poirier.

IT IS SO RECOMMENDED.

Signature Page Attached.

14

July 29, 2015
Charleston, South Carolina

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

**The parties' attention is directed to the important notice on the next page.**

15

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> **Robin L. Blume, Clerk**
> **United States District Court**
> **Post Office Box 835**
> **Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).